■ In the Matter of SIMONE D., Appellant. KATHLEEN IVERSON, Respondent. [821 NYS2d 248]—

In a proceeding for permission to administer electroconvulsive therapy to a patient without her consent, the patient appeals

from an order of the Supreme Court, Queens County (Rosengarten, J.), dated November 29, 2005, which, after a hearing, granted the petition.

Ordered that the order is affirmed, without costs or disbursements.

In the instant petition, Creedmoor Psychiatric Center (hereinafter Creedmoor) seeks permission to administer electroconvulsive therapy (hereinafter ECT) to the appellant without her consent. At a hearing held on the petition, Dr. Ella Brodsky, a licensed psychiatrist and the person who administers the ECT at Creedmoor, testified that the appellant suffers from a "major depressive disorder, severe, with chronic features" and was incapable of making decisions regarding her own treatment. In fact, Dr. Brodsky asserted that during a meeting to discuss treatment, at which the appellant, her Spanish-speaking attorney, Dr. Brodsky, and the treatment team were present, the appellant refused to respond or even make eye contact. Dr. Brodsky testified that, although the appellant had benefitted from ECT in the past, such treatments had ceased and the appellant had "decompensated," i.e., she had become withdrawn, mute, and nonparticipatory, and spent most of her time in a corner in a fetal position. Further, the appellant was not eating properly and had become aggressive and assaultive toward the staff and her fellow patients. Dr. Brodsky noted that on a prior occasion, the appellant needed to be fed through a tube, which was a "drastic remedy." By contrast, Dr. Brodsky testified that after the completion of the last course of 30 ECT treatments, the appellant had gained weight, was eating, drinking, and interacting with others, and "was not aggressive or assaultive at all." Dr. Brodsky noted that the appellant would be carefully monitored during the administration of ECT to determine her blood pressure, her EKG, her EEG, and her "mini-mental status." Dr. Brodsky further testified that many other forms of treatment had been tried and failed, including an extensive course of drug therapy, and that ECT was the least restrictive, clinically appropriate treatment for the appellant available at this time. She added, "[w]e don't have any other choices."

On cross-examination, counsel for the appellant questioned Dr. Brodsky concerning ECT treatments administered to the appellant in 1995 and 1996 in an effort to demonstrate that the appellant had suffered possible brain damage from those treatments. Dr. Brodsky testified that she had not reviewed the appellant's ECT records for that time period. She stated that she did not need to review the "old records" because medical assessments were updated so that she could "find everything in

the current record, whatever is important for an ECT." Dr. Brodsky added that the appellant was "regularly" receiving ECT since 1996. Thus, she opined that what occurred in 1996 was not relevant in assessing the appellant's current condition.

Counsel also questioned Dr. Brodsky concerning a variety of potential risks involved in the administration of ECT, including whether increases in blood pressure during treatment could induce hemorrhages in the brain, whether treatment could rupture the blood/brain barrier, how the amount of electric current used is determined, the risks of the anesthesia used during the treatments, and whether the patient feels pain during the treatment.

Based on this record, the petitioner established by clear and convincing evidence that the appellant lacked the capacity to make a reasoned decision with respect to the proposed treatment and that the proposed treatment was narrowly tailored to give substantive effect to her liberty interest (*see Rivers v Katz*, 67 NY2d 485, 497-498 [1986]; *Matter of Adam S.*, 285 AD2d 175, 178-179 [2001]; *Matter of Mausner v William E.*, 264 AD2d 485 [1999]; *Matter of Adele S. v Kingsboro Psychiatric Ctr.*, 149 AD2d 424, 424-425 [1989]).

Contrary to our dissenting colleagues' view, the Supreme Court did not improperly curtail the cross-examination of Dr. Brodsky. The nature and extent of cross-examination are matters within the trial court's sound discretion (*see People v Rodriguez*, 2 AD3d 464 [2003]; *People v Ayala*, 280 AD2d 552 [2001]). Respectfully, the dissent focuses only on certain selectively chosen portions of the cross-examination. When the cross-examination is viewed as a whole and properly analyzed in context, it is clear that the appellant's counsel was permitted extensive questioning on all relevant areas to be considered under *Rivers v Katz (supra)*. Indeed, while the direct examination of Dr. Brodsky encompassed only 13 pages of the hearing transcript, the cross-examination covered 44 pages.

Moreover, the Supreme Court providently exercised its discretion in denying the appellant's application for the appointment of an independent psychiatric expert. While a court "may" appoint an independent psychiatric expert (Judiciary Law § 35 [4]), here, an independent expert had already examined the appellant. Thus, the court's determination that "another [expert] opinion would not be necessary" was entirely proper.

We disagree with our dissenting colleagues' assertions that the court relied upon its own knowledge in reaching its determination. There is no indication in the record that the court based its decision on its own knowledge or became an unsworn wit-

ness. To the contrary, the court's determination is amply supported by the medical evidence presented, including the evidence elicited by the appellant's counsel during cross-examination.

The dissent's statement that the appellant has been subjected to an "extensive course" of ECT without "long-range benefit" is incorrect. The benefits to the appellant herein are crystal clear. As Dr. Brodsky recognized, although the appellant may not achieve remission, the treatment has improved her quality of life. Namely, with the treatment, she will not remain in a fetal position, she will eat, interact, and not pose a danger to herself or others. These positive responses to ECT cannot be dismissed or ignored.

Accordingly, under the circumstances of this case, the Supreme Court properly authorized the administration of ECT. Ritter, Rivera and Dillon, JJ., concur.

Crane, J.P. (dissenting and voting to reverse the order and remit the matter to the Supreme Court, Queens County, for a hearing before a different Justice to consider the issues anew upon taking testimony and, if it deemed it appropriate, after assigning an independent expert to conduct a psychiatric examination and report relevant recommendations, with the following memorandum, in which Goldstein, J., concurs). This is a proceeding pursuant to *Rivers v Katz* (67 NY2d 485 [1986]) to determine whether the respondent, Simone D., has the mental capacity to withhold her consent to electroconvulsive therapy (hereinafter ECT).

Simone D. was first admitted to Creedmoor Psychiatric Center in 1994 and suffers from a severe depressive disorder. Since 1995, she has undergone, over her objection but pursuant to previous court orders, at least 148 ECT treatments. Prior efforts to help her with medication failed to improve her condition. After two unsuccessful applications in July and September 2005 for permission to administer ECT to Simone D., the petitioner applied again in November 2005. The petition and supporting papers showed that without ECT Simone D. becomes depressed, stops eating and drinking, and requires nasogastric tube feeding. Allegedly, the ECT will diminish her assaultive behavior, enable her to eat, enhance self-care, and promote her ability to socialize.

At a hearing on the petition, the court rejected the request of Simone D.'s counsel that it appoint an independent psychiatrist. The petitioner called one of its psychiatrists, Dr. Ella Brodsky, who opined that Simone D. lacked the capacity to make a reasoned treatment decision and that ECT is the least restrictive alternative because there is no other choice.

Trying to undermine Dr. Brodsky's opinion, Simone D.'s counsel cross-examined Dr. Brodsky extensively. Simone D. claimed that ECT inflicted pain on her. So, counsel tried to focus on the pain a patient undergoing ECT might suffer. On a prior petition that did not result in court-ordered ECT, Simone D. had been examined by an independent expert who suggested the alternative of psychotherapy with a Spanish-speaking therapist. This therapy was tried, but for only a few weeks. In an effort to show that this alternative to ECT deserved a longer testing period, Simone D.'s counsel attempted to cross-examine Dr. Brodsky on this subject. In addition, Simone D. had experienced cognitive impairment from ECT, resulting in its discontinuance in 1996. Her attorney, therefore, tried to cross-examine Dr. Brodsky on the extensive course of ECT administered to his client over the years without permanent improvement.

When Simone D.'s counsel tried to ask questions about the physical pain ECT causes, and also about grand mal seizure, the court interceded and proclaimed that it was familiar with the workings of ECT. When counsel sought to elicit information about hemorrhages and the rupture of the blood/brain barrier caused by ECT, the court sustained the petitioner's objections. Likewise, the court thwarted counsel when he inquired about the dosage and duration of ECT, the Food and Drug Administration risk classification of ECT machines, and the identification of succinylcholine. These were but a few of the limitations the court placed on counsel as he attempted to show that Simone D. should not be forced yet again to undergo ECT.

At the conclusion of Dr. Brodsky's testimony, Simone D. renewed her application for an independent examination. The court denied the application as unnecessary. After closing arguments, the court found that it was in Simone D.'s best interest to administer ECT even though it acknowledged that she would probably never "get better": "she perhaps could die. Perhaps she wants to die. But that's not for us to determine. We must prevent her from dying."

The court prevented Simone D. from making a record that could be reviewed on appeal and instead became a silent witness relying on its own knowledge of ECT. The appellant, therefore, was unable to demonstrate the side effects of ECT, the risks of this course of treatment, and the potential alternatives that may be available. This was error in the circumstances of this case, particularly because of the extensive course of ECT treatments to which Simone D. has been subjected since 1995 without long-range benefit.

The court's reliance on its own knowledge was error in three respects. First, it violates the rule prohibiting a judge from considering, absent the parties' consent, facts outside the record (*see Silberman v Antar*, 236 AD2d 385 [1997] ["(t)he court improperly gave great weight to its own knowledge, based on personal observation of certain facts"]; *People v Weiss*, 19 AD2d 900 [1963]; *People v Lawrence*, 19 AD2d 899 [1963]; *People v Dow*, 3 AD2d 979 [1957]; Prince, Richardson on Evidence § 2-205 [Farrell 11th ed]).

Second, the court became an unsworn witness whose "knowledge" of the "facts" and the basis those "facts" form for his conclusion was never scrutinized or tested by cross-examination (*see e.g. People v Jie Mei Chen*, 26 AD3d 344, 345 [2006]; *People v Dow, supra* at 980).

Third, the details of the knowledge possessed by the court are not memorialized in the transcript, thus depriving all appellate courts of the ability to review the entire record and evaluate whether the petitioner has sustained its burden, in this case, by clear and convincing evidence (*see* Judiciary Law § 295; *People v Harrison*, 85 NY2d 794, 795-796 [1995]; *Rivers v Katz, supra* at 498; *People v Degondea*, 256 AD2d 39, 41 [1998] ["defendant was effectively thwarted from creating an adequate record for appellate review"]; *People v Robinson*, 209 AD2d 648, 649 [1994]). Put simply, there is no way to determine whether the petitioner met its burden because much of the evidence was contained only in the court's mind.

For these reasons, I respectfully dissent and would reverse the order and remit the matter to the Supreme Court, Queens County, for a hearing before a different Justice (*see People v Jie Mei Chen, supra; People v Dow, supra*) to consider the issues anew upon taking testimony and, if it deemed it appropriate, after assigning an independent expert to conduct a psychiatric examination and report relevant recommendations.